Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| GREGG FRANKLIN, individually and on behalf of all those similarly situated, | Case No. |
| *Plaintiff*, | |
| v. | **CLASS ACTION COMPLAINT** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ARIZONA BOARD OF REGENTS ex rel. ARIZONA STATE UNIVERSITY, | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiff Gregg Franklin in his capacity as Successor in Interest to Jason Franklin, deceased, brings this Complaint and Demand for Jury Trial against Defendants the National Collegiate Athletic Association ("NCAA"), Arizona State University ("ASU") ex rel. Arizona Board of Regents ("ABOR") to obtain redress for Jason Franklin, who was injured and died as a result of Defendants' reckless disregard for his health and safety as a student-athlete. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

**INTRODUCTION**

1. Nearly one hundred thousand student-athletes sign up to compete in college football each year, and it's no surprise why. Football is America's sport and Jason Franklin and football players like him were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching the game. On game days, hundreds of thousands of fans fill stadium seats and even more watch around the world. Before each

game, these players—often mere teenagers—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going.

2.     However, for years Defendants kept players like Jason Franklin and the public in the dark about an epidemic that was slowly killing college athletes—and then, as the epidemic barely began to come to light, failed to take adequate steps to manage it.

3.     During the course of a college football season, athletes absorb hundreds of impacts greater than 10 Gs (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20 Gs, with some approaching 100 Gs. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and weren't wearing a seatbelt, the force of you hitting the windshield would be around 100 Gs. Thus, each season these 18, 19, 20, and 21-year-old student-athletes are subjected to repeated car accidents.

4.     Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long-term brain injuries, including memory loss, dementia, cognitive impairment, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and more. Meaning, long after they played their last game, they are left with a series of neurological conditions that could slowly strangle their brains.

5.     For decades, Defendants knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.     While in school at ASU, football players like Jason Franklin are ultimately under Defendants' care. Unfortunately, Defendants did not care about the off-field consequences that would haunt students, like Jason Franklin, for the rest of their lives.

7.     Despite knowing for decades of a vast body of scientific research describing the danger of concussive and sub-concussive impacts like those Jason Franklin experienced, Defendants failed to implement adequate procedures to protect Franklin from the long-term dangers associated with them. They did so knowingly and for profit.

1    8.    As a direct result of Defendants' acts and omissions, Jason Franklin suffered brain

2 and other neurocognitive injuries from playing NCAA football, culminating in his tragic suicide by

3 hanging at age 26. Post-mortem testing performed on his brain confirmed that he suffered from

4 Stage II CTE.

5    9.    As such, Plaintiff brings this Complaint in order to vindicate Franklin's rights and

6 hold Defendants accountable for their acts and omissions.

7                                    **PARTIES**

8    10.    Plaintiff Gregg Franklin is a citizen of the State of California, and Jason Franklin

9 was a citizen of California when he died (*See* Certificate of Death, attached hereto as Exhibit A.)

10    11.    Defendant NCAA is an unincorporated association with its principal place of

11 business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is

12 not organized under the laws of any State, but is registered as a tax-exempt organization with the

13 Internal Revenue Service. As such, Defendant NCAA is a citizen of Indiana pursuant to 28 U.S.C.

14 § 1332 (d)(10). Defendant NCAA conducts business throughout this District, the State of

15 California, and the United States.

16    12.    Defendant ASU is a public university and part of the Arizona university system.

17 ABOR is the governing body that oversees ASU and the Arizona university system pursuant to

18 state law. Both ASU and ABOR are organized under the law of Arizona. ASU's address is 300 E.

19 University Drive, Tempe, Arizona 85281. ABOR's address is 2700 N. Central Avenue, Suite 850,

20 Phoenix, Arizona 85004.

21                          **JURISDICTION AND VENUE**

22    13.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §

23 1332(d)(2) because (a) at least one member of the Class, which consists of at least 40 members, is a

24 citizen of a different state than Defendant, (b) the amount in controversy exceeds $5,000,000,

25 exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this

26 action.

27    14.    This Court has personal jurisdiction over Defendant NCAA because it conducts

significant business in this District, including establishing consumer and business contracts here, and because it maintains its principal place of business in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant ABOR and/or ASU resides here.

## FACTUAL BACKGROUND

**I.     Defendants Had a Duty to Protect Student-Athletes, Including Jason Franklin.**

16.     The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including the football program at ASU. According to the NCAA, "[m]ore than 1,200 schools, conferences and affiliate organizations collectively invest in improving the experiences of athletes—on the field, in the classroom, and in life."

17.     The NCAA brings in more than $750 million in revenue each year, and is the most significant college sports-governing body in the United States.

18.     To accommodate the wide spectrum of athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.

19.     Each NCAA division is composed of several "conferences" to facilitate regional league play.

20.     ASU currently has a NCAA Division I football program in the Pac-12 conference.

21.     The ASU football program has a strong following that generates millions of dollars per year for the school. Given its significant following and numerous on-field successes, the ASU football team attracts high-end talent from high schools across the country. Well over 100 former ASU players have been drafted to play professional football in the National Football League ("NFL").

22.     Defendants together govern and regulate the ASU football program and owe a duty to safeguard the well-being of ASU's student-athletes.

23.     Since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of

student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2]

24.     As such, the genesis of the NCAA was for a singular goal: "to keep college athletes safe."[3]

25.     According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives [while each] division creates its own rules that follow the overarching principles of the NCAA."[4]

26.     The overarching principles of the NCAA, including its purported commitment to safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

> The purposes of this Association are:
>
> (a)   To initiate, stimulate and improve intercollegiate athletics
>        programs for athletes;
>
> (b)   To uphold the principal of institutional control of, and
>        responsibility for, all intercollegiate sports in conformity with the

---

[1] *Who We Are*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are (last visited July 13, 2020).

[2] In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

[3] *Well-Being*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/health-and-safety (last visited July 13, 2020).

[4] *Membership*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are/membership (last visited July 13, 2020).

constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b) (emphasis added).

27. The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

28. Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

**2.2 The Principle of Student-Athlete Well-Being.**

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)

**2.2.3 Health and Safety.**

It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

29. To accomplish this purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. Both NCAA member institutions, including ASU, and NCAA conferences are obligated to abide by the NCAA's rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

30.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[5]

31.     The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which NCAA athletes, including Jason Franklin during his life, as well as schools like ASU, could rely for guidance on player-safety issues.

32.     Jason Franklin relied upon the NCAA's authority and guidance to protect his health and safety by treating and preventing head-related injuries, including the effects of those head injuries later on in his life. The same was true as between Franklin and ASU.

33.     As compared to Jason Franklin and other ASU football players, the NCAA and ASU were in a superior position to know of and mitigate the risks of sustaining concussions and other TBIs while playing football at ASU. They failed to do so.

**II.     Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.**

34.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to—memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and CTE.

35.     Such violent impacts to the head are a one-way street for those who experience them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and

---

[5] John T. Parsons, *2014-15 NCAA Sports Med. Handbook*, Nat'l Collegiate Athletic Ass'n (Aug. 2014), https://bit.ly/2QD5DUx.

one's "best bet is to avoid concussions altogether."[6]

36.     To better understand the results of these studies, a brief introduction to concussions in football follows.

**A.      An Overview of Concussions in Football.**

37.     A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

38.     A concussion is a TBI initiated by an impact to the head, which causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

39.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

40.     Concussions typically occur when linear and rotational accelerations impact the brain, through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs. This is slightly more force than a fighter pilot receives from performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

    i.      *Concussion Symptoms.*

41.     When a collegiate athlete suffers a severe impact to the head, he may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

---

[6] Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck Sch. of Med. at USC, https://bit.ly/2MzSkkC (last visited July, 10 2020).

- memory loss;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; and

- feeling overly tired.

42.     A collegiate athlete may not recognize the signs and/or symptoms of a concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.     *Post-Concussion Treatment.*

43.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because immediately after a concussion, the brain is particularly vulnerable to further injury. Even after the immediate effects have worn off, a person who has suffered a concussion is four to six times more likely to receive another concussion than a person who has been concussion-free.

44.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

45.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, and sometimes can even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

46.     Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate the effects of concussions are anything but temporary.

**B.      Studies Confirm the Dangers and Long-Term Effects of Concussions.**

47.     Two leading studies on the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the "tau protein."

48.     Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelczyk, and Damien Nash. Waters killed himself; Nash died unexpectedly at the age of 24; Webster, homeless and cognitively impaired, died of heart failure; and Strzelczyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE—a progressive, degenerative disease of the brain found in people with a history of repetitive brain trauma.

49.     In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and 48 of 53 former college players (91%).[7]

50.     These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical literature.

51.     Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as

---

[7] Jesse Mez, MD, MS, et al., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of Am. Football*, 318 JAMA 4, 360–370 (2017).

easily when "no loss of consciousness occurs at all," and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less severe appearance.[8] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight."[9]

52.    Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[10] Similarly, the risks of concussions in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[11]

53.    Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs, connect it to contact sports (including football) and find that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

54.    For instance, in 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[12] Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the*

---

[8] Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A System of Med., Vol. 8 231-32 (2d ed. 1910).

[9] *Id.*

[10] Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

[11] Edward Nichols, *The Physical Aspect of Am. Football*, 154 Bos. Med. & Surgical J.1 (1906).

[12] Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).

*American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[13]

55.     Countless studies were later conducted on boxers suffering chronic neurological symptoms as a result of repeated head injuries, and who displayed signs of dementia and impairment of motor functions.[14] As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[15]

56.     In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch drunk had been recognized among football players.[16]

57.     The next year, the American Football Coaches Association published a report warning that players who suffer even "one concussion" should be removed from play.[17]

---

[13] Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

[14] *See, e.g.*, E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology & Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2 Lancet 719 (Sept. 1937).

[15] K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

[16] Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

[17] Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

-12-

58.     In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[18]

59.     Starting in the late 1960s, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[19] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

60.     In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls while hunting or steep chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which entails intermittent trauma to the head can cause it.**[20]

61.     Overall, countless studies—published in prominent medical journals such as the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions and head injuries. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has

---

[18] Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

[19] John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clinical Neurophysiology 183 (1968).

[20] J.W. Graham, *Eight, Nine, Out! Fifty Years as Boxer's Doctor*, 56 (1975).

CLASS ACTION COMPLAINT

-13-

potential dangerous long-term effects on brain function;

- traumatic encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;
- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) in the brainstem;
- with respect to head injuries in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
- immediate retrograde memory issues occur following concussions;
- head injuries require recovery time without risk of subjection to further injury;
- a football player who suffers a concussion requires significant rest before being subjected to further contact; and
- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

62. As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

63. By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

64. In 2003, a NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[21]

65. Following these studies, in 2004, the National Athletic Trainers' Association

---

[21] Michael McCrea, et al., *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study*, The Journal of the Am. Med. Ass'n (November 19, 2003), http://jama.jamanetwork.com/article.aspx?articleid=197668.

published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including holding out athletes who exhibit symptoms of a suspected head injury.

66.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports, based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

67.     Ultimately, while Defendants knew of the harmful effects of TBIs (and other head injuries) on athletes for decades, they ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including Jason Franklin. For ASU, the continued expansion and operation of college football was simply too profitable to put at risk.

### III.     Defendants Ignore the Dangers of Concussions and Fails to Implement Adequate Concussion Management Protocols and Requirements.

68.     For decades, Defendants have been aware—through institutional knowledge, research, and current medical science, among other sources of information—that severe and/or repeated head impacts can lead to long-term brain injuries, including memory loss, dementia, depression, and CTE. Unfortunately, while Defendants knew about the harmful and devastating effects of these sub-concussive and concussive injuries, they recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect its athletes, including Jason Franklin.

69.     But as to college football, including ASU's football program, Defendants continued to govern, support, and profit from the sport without disclosing what it knew to student-athletes, including Jason Franklin.

### A.     NCAA Fails to Adopt Any Concussion Protocols for Decades.

70.     Since at least 1933, the NCAA has known of the serious nature of concussions and

other head injuries in college football, and even recognized the need for appropriate concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

71.     The 1933 Sports Medicine Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. It discussed head injuries, stating that they "are in a category by themselves and warrant special attention," as they "may be, and often are more severe in their immediate and remote consequences" than other injuries. Notably, the 1933 Sports Medicine Handbook recommended that, when concussion-related symptoms lasted longer than two days, players should "not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this," and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

72.     The NCAA recognizes that its Handbook "may constitute some evidence of the legal standard of care," and has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral obligation to make sure we do everything we can to protect and support student-athletes."

73.     Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement on the dangers of repeated head injuries in football, stating:

> [T]hose individuals who have been rendered unconscious, even
> momentarily, in a given game should never be allowed to play again
> in the same game and not allowed to return to contact until all
> symptoms have cleared up entirely and he has been checked by a
> competent medical authority.

74.     Rather than inform Jason Franklin of these risks or implement protocols to protect

and safeguard him from TBI-related injuries (as the NCAA and ASU promised to do through the NCAA Constitution, among other things), neither the NCAA nor ASU failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010, at the earliest.

75.     It was not until April 2010, under mounting public pressure, that the NCAA made some changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports. However, these changes were little more than a gesture that the NCAA had no plans to enforce, and grossly insufficient for purposes of protecting Jason Franklin and football players like him. The NCAA's additional requirements were far from adequate, and what's more, it has admitted that it had no intent on penalizing institutions (such as ASU) that failed to implement the requirements as written, or at all.

76.     Similarly, ASU adopted a variation of a CMP that was grossly insufficient, overly vague, and well short of what was necessary to educate and protect Jason Franklin (and players like him) from the risks of concussive and sub-concussive blows to the head.

77.     Defendants' paltry efforts failed: Jason Franklin received at least four preventable concussions at ASU, developed CTE, and ultimately committed suicide following a mental breakdown caused by his concussions and repetitive sub-concussive impacts.

**B.     ASU Adopts New, Deeply Flawed Concussion Management Requirements.**

78.     On April 29, 2010, the NCAA adopted a "Concussion Policy and Legislation," to be effective as of August 2010 (*i.e.,* approximately the beginning of the Fall 2010 college football season).

79.     The 2010 Concussion Management Protocol Rule ("2010 CMP Rule"), found at NCAA Bylaw 3.2.4.20, required active NCAA member institutions to develop a concussion management protocol ("CMP") that included the following: (a) an annual education process on concussions for athletes, which requires athletes to acknowledge receiving information about the signs and symptoms of concussion; (b) a process that "ensures" students who exhibit concussion

symptoms are removed from athletics and evaluated by a medical professional; (c) a policy precluding immediate return-to-play for concussed athletes for "at least the remainder of that calendar day"; and (d) a policy requiring medical clearance by a physician for a concussed athlete to return to athletics.

80.     Further, and importantly, under this new policy, member schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from athletic activities and evaluated by a medical staff member with experience in the evaluation and management of concussions."

81.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of a concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

82.     The NCAA's requirements in the 2010 CMP Rule were flawed from the outset: due to the very nature of concussions, athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as the NCAA, to identify concussive injuries in real-time and take appropriate remedial actions.

83.     Documents distributed by the NCAA to member institutions regarding concussions were flawed, too. For example, both in 2010 and *to this day*, the NCAA "Best Practices" manual on the "Diagnosis and Management of Sport-Related Concussion"—or similar documents published by the NCAA for its member institutions and the public—cited at least six articles co-authored by the University of North Carolina at Chapel Hill's ("UNC") Kevin Guskiewicz, who currently serves as

interim chancellor but previously conducted significant research on traumatic brain injury at UNC. However, a 2019 review of studies co-authored by Guskiewicz found that his work contained deeply problematic omissions, including a failure to disclose that his student-athlete populations had significantly high rates of learning disorder, ADHD, and/or ADHD-related stimulant use. Worse, Guskiewicz had repeatedly failed to disclose significant conflicts of interest he held, given his work for and with entities like the NFL and the NCAA.[22]

84.     Finally, many of the omissions of the pre-2010 era remained with the imposition of the 2010 CMP Rule. For example, the NCAA:

- continued to fail to warn student-athletes, including football players like Jason Franklin, about any of the risks of repetitive sub-concussive injury;

- continued to fail to disclose all of the potential long-term risks of concussion, instead continuing to present concussion as a one-time, short-term event that one will recover from with the correct treatment;

- continued to fail to warn student-athletes that the football helmets they were using were not designed to prevent concussion, nor were designed or tested for their ability to prevent the transfer of rotational accelerative forces, *i.e.,* the key forces that cause concussion and other forms of head injury; and

- continued to allow "scout team" players to effectively serve as punching bags for member institutions' first-string offensive and defensive squads, without additional preparation for, attention to, or protection from the special risks they incur.

85.     Behind its facade of concern, the NCAA never seriously intended the 2010 CMP Rule to have force. As the NCAA's director of enforcement stated after the 2010 CMP Rule's adoption, the rule was specifically "not about enforcing whether or not [schools] were following their [concussion management] plan."[23]

---

[22] *See* Christian Red, *Failure to Disclose: The Mysterious Absence of Critical Data from UNC's Renowned Concussion Research*, THE ATHLETIC, https://bit.ly/31YKZTN (Oct. 8, 2019); Ted Tatos & Don Comrie, *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*, 1 J. Sci. Practice & Integrity (June 2019).

[23] Nathan Fenno, *Internal NCAA Emails Raise Questions About Concussion Policy*, WASH. TIMES

86. Indeed, during a civil lawsuit by former NCAA football players, former NCAA official David Klossner admitted this during a deposition:

> *Q: Are member institutions required to submit their concussion*
>
> *management plans to the NCAA?*
>
> *A: No.*
>
> *Q: Is there any oversight by NCAA that would confirm whether or not a*
>
> *school has a concussion management plan?*
>
> *A: No. [Klossner initiates discussion on meaning of oversight]*
>
> *Q: Have any member schools been disciplined regarding concussion*
>
> *management plans?*
>
> *A: Not to my knowledge.*
>
> *Q: Has the NCAA considered disciplining institutions regarding*
>
> *concussion management plans?*
>
> *A: No, not to my knowledge.*

87. Thus, the NCAA's approach to enforcing its own 2010 CMP Rule was non-existent, rendering it useless and toothless. On balance, between 2010 and 2015, the NCAA tried its hardest *not* to impose significant restrictions or penalties on violating member institutions—promoting itself as a protector of student-athletes in public, but doing virtually nothing in private.

88. Upon information and belief, ASU understood that no action would be taken against it by the NCAA for violation the 2010 CMP Rule or otherwise failing to implement an appropriate Concussion Management Protocol.

89. Indeed, despite the NCAA's implementing the 2010 CMP Rule, ASU continued to follow a concussion management regime that was deeply flawed, ineffective, and a direct contributor to Jason Franklin's eventual development of CTE and death.

90. In 2011, ASU implemented a CMP.

---

(July 20, 2013), https://cite.law/27V8-ASKT.

91. While this policy was, on the surface, an attempt to implement the NCAA's 2010 CMP Rule—which was itself inadequate, recall—the policy leaves much to be desired. Notably, the policy fails to mention the risks of repetitive sub-concussive injury at all, and fails to mention any of the potential *long-term* risks of a concussion. Such a policy would not have effectively warned ASU players (including Jason Franklin) about the risks inherent in playing football at ASU.

92. Worse, ASU's CMP did not require players who sustained a concussion during a game to be removed from play for the remainder of the game, at minimum.[24]

93. Worse still, public information shows that the already deficient CMP had a rocky rollout, at best. For example, a 2019 study of ASU athletes (including non-football players) found that "student athletes tend to say that educational materials [on concussions] are not memorable," and information about the risks of concussions are infrequently provided and surface-level.[25]

94. ASU could certainly have required football players like and including Jason Franklin to undergo more intensive education about concussions, but it did not. Nor did the NCAA do anything to ensure that ASU would.

**FACTS SPECIFIC TO JASON FRANKLIN**

95. Jason Franklin was born on May 6, 1992 in Simi Valley, California. Up until the final year of his life, Jason was a talkative, social young man with a bright future.

96. During high school, Jason attended Chaminade College Preparatory School in Los Angeles, California. He played football all four years of high school, and was a three-year varsity starter on the football team.

97. Beginning in his senior year of high school, Jason began the process of considering and applying to various colleges. Among other considerations, Jason wanted to attend a school where he could continue playing football. He applied to a number schools and was accepted by

---

[24] *See* Jason Segall *How Long Should a Player Sit Out After Getting a Head Injury*, HEAD INJURIES IN FOOTBALL (Apr. 12, 2013), https://cite.law/56MG-T6WC.

[25] *See* Steven R. Corman, et al., *Socioecological Influences on Concussion Reporting by NCAA Division 1 Athletes in High-Risk Sports*, PLOS ONE, at 13 (2019).

several, including Valparaiso University (where he was offered a full scholarship to play football),
Duke University, Colombia University, University of Missouri, and University of Colorado –
Boulder. Each school offered Jason the opportunity to play football, either directly or as a preferred
walk-on (*i.e.,* he would still have to try out for the team, but be given preferred status). He visited
Valparaiso, Duke, and Colombia in anticipation of accepting one of their offers.

98.     Jason also applied to ASU—however, because ASU did not initially recruit Jason
for their football team or offer him a walk-on opportunity, he did not strongly consider attending.

99.     This changed in early 2011 when Trent Bray, then ASU's linebacker coach, saw a
video of Jason's high school football highlights on the Internet. Bray then called Jason directly and
strongly encouraged him to reconsider coming to ASU. Bray assured Jason that he would be
treated as a preferred walk-on if he agreed to attend. Later, Bray invited Jason and his family to
come to ASU, which they did. The family met with ASU's coaching staff during this visit.

100.     Ultimately, based entirely on Bray's outreach and promise to give him preferred
walk-on status, Jason decided to attend ASU despite a lack of a scholarship offer.

101.     That summer, he tried out for the football team and was accepted, and started school
at ASU that fall. Prior to playing football, ASU administered "baseline testing" to Jason, or an
assessment of his pre-collegiate football neuropsychological functioning. He received a score of
zero on that testing, indicating an absence of neuropsychological symptoms.

102.     During his time playing football at ASU, Jason Franklin suffered multiple
concussions. He was also subjected to countless sub-concussive hits as a part of practice and
gameplay.

103.     In particular, as a member of ASU's "scout team" Jason was often used as a
punching bag for bigger, stronger first-string players. For example, early on at ASU, Jason was
required to participate in a practice drill in which two players run at each other and try to tackle the
other to the ground. In one drill, he was put up against then-senior ASU player Vontaze Burfict.
(Burfict now plays as a linebacker for the Oakland Raiders, and is a notoriously hard-hitter who in

2019 was suspended for 12 games over a helmet-to-helmet hit.[26]) Burfict hit Jason so hard that he flew into the air, ultimately hitting his head on the ground.

104.    In December 2012, Jason received a concussion during practice and reported it to his team physician.

105.    In August 2014, Jason received another concussion during practice, which he reported to his team doctor and coach.

106.    In early September 2014—with two concussions already under his belt—Jason experienced yet another concussion during practice, which he reported to his team doctor. Although Jason was kept out practice for a couple of weeks, he was cleared to return by the end of September.

107.    At the end of September 2014, Jason experienced yet another concussion, which he reported to his team doctor.

108.    At no point before, during, or after any of these incidents did the ASU warn Jason of the risks of continuing to play football after sustaining multiple concussions; warn (much less reiterate to) Jason of his increased risk of receiving another concussion in the future; inform Jason that his football helmet was not designed with concussion-prevention in mind; or inform him that continuing to play football carried a significant risk of latent brain injury and related symptoms, including but not limited to CTE.

109.    Following college, Jason held odd jobs. However, he became increasingly manic, began experiencing mood swings, had difficulty sleeping, and began to experience delusions of grandeur.

110.    In July 2017, at age 25, Jason moved back to California from Arizona. His deceased grandparents had left him a house in Mar Vista, California, and Jason lived in the house for nearly a year.

111.    Although Jason's condition was already poor, things quickly spiraled out of control.

---

[26] Josh Schrock, *Jon Gruden 'Still Not Happy' With Vontaze Burfict's 12-Game Suspension*, NBC SPORTS (Oct. 16, 2019), https://bit.ly/2IYJUnD.

In the fall of 2017, Jason became fixated on conspiracy theories regarding the Illuminati, culminating in a psychotic episode in which he angrily yelled at his parents and claimed to be Jesus. Then, in April 2018, Jason experienced a psychotic episode during which he believed his parents were trying to kill him. Jason was then hospitalized against his will.

112.    Upon his release in May 2018, Jason effectively absconded back to Arizona, where his condition continued to worsen.

113.    Jason Franklin ultimately committed suicide by hanging in his apartment on July 14, 2018. He was 26 years old.

114.    Subsequently, tissue samples from Jason's brain were sent to Boston University's Chronic Traumatic Encephalopathy Center in Boston, Massachusetts.

115.    In August 2019, a neuropathological assessment of Jason's brain concluded that Jason suffered from Chronic Traumatic Encephalopathy.

116.    During the time Jason Franklin played football at ASU, there were no adequate concussion management protocols or policies in place to address and treat concussions (to say nothing of repetitive sub-concussive impacts) sustained by student-athletes during practice and in games.

117.    In fact, although Franklin sustained repetitive serious blows to the head in practices and games, ASU failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on ASU's football team. Each time Franklin suffered a concussive or sub-concussive hit, Defendants deprived him of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate the risks associated with TBIs.

118.    Such changes would have been easy to make and have had profound impacts when implemented.[27]

119.    Had Defendants disclosed the truth to Jason Franklin, he would have, at minimum,

---

[27] *See, e.g.*, Lindsay Tanner, *Football Concussion Rates Plummet After One Simple Rule Change, Study Shows*, TIME (Oct. 2, 2018), https://ti.me/2O7pKrg.

taken more precautions to protect his head and otherwise ensure his safety while playing, and taken more rest following a serious blow to the head, including and especially one resulting in a concussion.

120.    Indeed, had Defendants been honest with Jason Franklin about the long-term consequences of taking repeated blows to the head while playing football, he would not have continued to play football at all.

121.    As a result of these injuries and Defendants' failure to adhere to a reasonable duty of care towards Jason Franklin, he experienced psychosis, depression, mood swings, anxiety, loss of concentration, paranoia, suicidal thoughts, and of course, CTE, *all* of which caused and led to Franklin's taking his own life by hanging.

## CLASS ACTION ALLEGATIONS

122.    **Class Definition**: Plaintiff brings this action for himself and on behalf of a class of similarly situated individuals, defined as follows:

> All now-deceased individuals who participated in ASU's football program between 1952 and 2015, and were diagnosed during life or post-mortem with Alzheimer's disease, dementia, Parkinson's disease, CTE, or any other significant neurodegenerative disorder or disease.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

123.    **Numerosity**: The exact number of members of the Class is not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. Upon information and belief, hundreds of individuals fall into the definition of the Class.

124.   **Commonality**: There are many questions of law and fact common to Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to, the following:

(a)   Whether Defendants had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)   Whether Defendants had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related brain injuries;

(c)   Whether Defendants' conduct as alleged herein constitutes negligence;

(d)   Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief; and

(e)   Whether Defendants caused Jason Franklin's death.

125.   **Typicality**: Plaintiff's claims are typical of those of members of the Class, as Plaintiff and other members sustained injuries arising out of the same wrongful conduct of Defendants.

126.   **Adequate Representation**: Plaintiff will fairly and adequately represent the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

127.   **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION

## Negligence (Wrongful Death)
## (On Behalf of Plaintiff and the Class)

128.     Plaintiff incorporates by reference the foregoing allegations.

129.     From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions, including Jason Franklin and the Class. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes. Further, as an NCAA member institution, ASU also held these duties to players like and including Jason Franklin.

130.     The duties of Defendants included specific obligations to supervise, regulate, and monitor the rules of the ASU football program, and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to ASU football players, including Jason Franklin and the Class.

131.     Defendants had a duty to educate ASU football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. Defendants' duties further included a duty to warn student-athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

132.     Defendants also had a duty not to conceal material information from ASU football players, including Jason Franklin and the Class.

133.     Defendants breached their duties owed to Jason Franklin by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of concussions on the playing field, in the locker room, and in the weeks and months after they sustained concussions, as well as providing treatment for the latent effects of

concussions. These failings included, but are not limited to:

(a) failing to adequately recognize and monitor concussive and sub-concussive injuries during football practices and games;

(b) failing to adequately inform Franklin of the dangers of concussive and sub-concussive injuries;

(c) failing to adequately design and implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d) failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e) failing to adequately warn Franklin and the Class about the shortcomings of their football helmets;

(f) failing to provide adequate, additional protections for Franklin and the Class as members of ASU's "scout team"; and

(f) failing to adequately provide Franklin and the Class notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time he left ASU.

134. Defendants breached their duties to Jason Franklin and the Class by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Jason Franklin and the Class.

135. Jason Franklin and the Class relied upon the guidance, expertise, and instruction of Defendants in understanding the risks associated with the serious and life-altering concussive and sub-concussive hits in football.

136.     At all times, Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries, including through their institutional knowledge of such effects. Because such information was not readily available to ASU football players, including Jason Franklin and the Class, Defendants knew or should have known that they would act and rely upon the guidance, expertise, and instruction of Defendants on these crucial medical issues while attending ASU and thereafter.

137.     Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as tau protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928, and explicitly connected to football by the NCAA itself not long after.

138.     In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing Alzheimer's disease, especially at an early age, as well as CTE.

139.     Jason Franklin experienced repetitive sub-concussive and concussive impacts during his college football career, which significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE and other similar cognitive-impairing conditions. And Franklin did, in fact, develop CTE which—as a secondary consequence—ultimately led him to take his own life.

140.     The repetitive head accelerations, hits, and TBIs to which Jason Franklin and the Class were exposed to as ASU football players presented risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence, the risk of harm to Jason Franklin and the Class would have been materially decreased, and Jason Franklin would not have developed CTE and taken his own life.

141.     Thus, as a direct and proximate result of Defendants' negligence, Jason Franklin

took his own life.

142. As a result of their negligence, Defendants are liable to Plaintiff and the Class for the full measure of damages and other relief allowed under applicable law for causing the death of Jason Franklin and the death of and/or injury to members of the Class, including but not limited to the loss of Jason Franklin's care, support, advice, companionship, and moral support.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gregg Franklin, as Successor in Interest to Jason Franklin, respectfully requests that the Court enter an Order providing for the following relief:

A. Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as representative of the Class, and appoint his counsel as Class Counsel;

B. Declare that Defendants' actions, as set out above, constitute negligence and caused the death of Jason Franklin and the Class;

C. Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and all other damages suffered, including any future damages likely to be incurred by Plaintiff and the Class;

D. Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

E. Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G. Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**GREGG FRANKLIN**, as Successor in Interest to
Jason Franklin, deceased,

Dated: July 13, 2020            By: /s/ Jeff Raizner
*One of Plaintiff's Attorneys*

Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

*Counsel for Plaintiff and the Putative Class*